IN THE UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JULIE HAVENS, | : | |
| | : | |
| Plaintiff | : | |
| | : | |
| v. | : | CIVIL NO. 3:13-CV-00600 |
| | : | |
| CAROLYN W. COLVIN, ACTING | : | (Judge Kane) |
| COMMISSIONER OF SOCIAL | : | |
| SECURITY, | : | |
| | : | |
| Defendant | : | |

## MEMORANDUM

Plaintiff Julie Havens has filed this action seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying Havens' claim for social security disability insurance benefits. (Doc. 1).

Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes. Havens met the insured status requirements of the Social Security Act through December 31, 2014. Tr. 17. In order to establish entitlement to disability insurance benefits Havens was required to establish that she suffered from a disability on or before that date. 42 U.S.C. § 423(a)(1)(A), (c)(1)(B); 20 C.F.R. §404.131(a)(2008); see Matullo v. Bowen, 926 F.2d 240, 244 (3d Cir. 1990).

I.     **BACKGROUND**

Havens protectively filed her application for disability insurance benefits on

December 3, 2010, claiming that she became disabled on July 30, 2009.  Tr.

14, 124.  The doctrine of *res judicata* limited the beginning of her period of

alleged disability to May 21, 2010.  Tr. 14-15.  Havens has been diagnosed

with several impairments, including:  diabetes, obesity, headaches, high

cholesterol, hypertension, bipolar disorder, and personality disorder.  Tr. 17-

18.  On May 27, 2011, Havens' application was initially denied by the

Bureau of Disability Determination. Tr. 105.

On June 7, 2011, Havens requested a hearing before an administrative law

judge ("ALJ").  Tr. 110.  The ALJ conducted a hearing on May 9, 2012, where

Havens was represented by counsel. Tr. 35-63.   On July 26, 2012, the ALJ issued

a decision denying Havens' application. Tr. 14-28.  On January 5, 2013, the

Appeals Council declined to grant review.  Tr. 1.  Havens filed a complaint before

this Court on March 5, 2013.   (Doc. 1).  Supporting and opposing briefs were

submitted and this case became ripe for disposition on January 9, 2014, when

Havens filed a reply brief.  (Docs.14, 19, 22).

Havens appeals the ALJ's determination on four grounds: (1) the ALJ erred

in finding that Havens did not meet or equal a listing at step three, (2) the ALJ

improperly discounted Havens' credibility, (3) the ALJ erroneously rejected the

opinion of Havens' treating physician, and (4) the ALJ's reliance on the opinion of

a state agency physician was flawed.  (Doc. 14).  For the reasons set forth below,

the decision of the Commissioner is affirmed.

II.   **STATEMENT OF RELEVANT FACTS**

Havens is 45 years of age, has a Bachelor's degree and two Associate's

degrees, and is able to read, write, speak, and understand the English

language. Tr.  38-39, 169.  Havens' past relevant work includes work as a

home health care resident nurse, which is classified as medium, skilled

work.  Tr. 45-46.

A.   **Havens' Mental Impairments Prior to the Relevant Period**

In July 2003, and again in August 2003, Havens was hospitalized due to her

mental impairments.  Tr. 208-11, 216-19.  In 2007, Havens began receiving

psychiatric treatment from Matthew Berger, M.D. and his staff.[1]  Tr. 374-429.

In the year-and-a-half period prior to the relevant period, Havens presented

to Dr. Berger seven times.  Tr. 376-94, 527-30.  Throughout much of 2009, Dr.

Berger's objective findings were relatively similar.  At each appointment, Dr.

Berger found that Havens' affect was appropriate and her speech was clear and

fluent.  Id.  Havens' language processing was consistently intact, her thought

processes demonstrated coherence and logic, and her associative thinking was

---

[1] Dr. Berger's staff consisted of Amy Blitz, CRNP, Teresa Clark, CRNP, and Martin Kravchick, LCSW.  For simplicity, Dr. Berger and his staff will collectively be referred to as "Dr. Berger."

intact.  Id.  She was alert and oriented and her immediate, recent, and remote

memory was intact.  Id.  Havens' attention span and concentration were normal,

her judgment was realistic and intact, and her insight was intact and appropriate.

Id.

    At each appointment, Havens denied anxiety and depression, and Dr. Berger

noted that she did not demonstrate any symptoms of anxiety or depression.  Id.  Dr.

Berger repeatedly diagnosed Havens with Bipolar I Disorder accompanied by

depression, and Personality Disorder NOS.  Id.  Throughout much of 2009, Dr.

Berger assigned Havens a GAF score of fifty-seven.[2]  Id.

    By December 23, 2009, Havens mental condition deteriorated slightly.  Tr.

376.  Havens was struggling with being separated from her husband and estranged

from her oldest daughter; she told Dr. Berger that she "could be better."  Id.

However, Havens denied anxiety or depression, and Dr. Berger wrote that Havens

did not demonstrate any symptoms of anxiety or depression.  Id.  Dr. Berger's

objective findings remained unchanged from previous appointments, as did his

diagnoses.  Tr. 377.  Dr. Berger assigned a GAF score of fifty-two.  Id.

    On April 12, 2010, Havens returned to Dr. Berger for her last appointment

prior to the relevant period.  Tr. 527-30.  Havens reported "having difficulty

_____

[2]A GAF score between 51 and 60 indicates "moderate symptoms (e.g. flat affect and
circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or
school functioning (e.g. few friends, conflicts with peers or co-workers)."  Diagnostic and
Statistical Manual of Mental Disorders, 34 (4th ed., Text rev., 2000).

dealing with people due to the illness" and stated it did not matter if she was on medication or not. Tr. 527. Havens stated that she was no longer taking her medications. Id. Havens again denied anxiety or depression, and Dr. Berger again opined that she did not demonstrate any symptoms of anxiety or depression. Id. Havens was cooperative, though she displayed anxiety and depression consistently throughout the appointment. Tr. 529. Dr. Berger assigned a GAF score of fifty-one. Id.

### B.   Havens' Mental Impairments During the Relevant Period

On September 14, 2010, Havens reported "having issues with [her] memory" and being "very forgetful to the point where [her] children [were] noticing." Tr. 531. Havens also reported increased impulsivity and worsening memory, but decreased sadness and decreased feelings of hopelessness. Id. Havens still was not using her medication at that time; she denied depression or anxiety, and Dr. Berger opined that she did not "demonstrate any symptoms of" depression or anxiety.[3] Id.

Havens was cooperative with an improved mood and appropriate affect. Tr. 532. Her speech was clear, fluent, spontaneous and tearful; she had intact language processing, coherent and logical thought processes, and intact associative

---

[3] Havens denied anxiety or depression at every single appointment with Dr. Berger, and Dr. Berger consistently opined that she did not demonstrate any symptoms of anxiety or depression. Tr. 534, 538, 542, 546, 641, 717, 720, 729, 733, 737.

thinking.  Id.  Havens was alert and oriented, her recent and remote memory was intact, she had a normal attention span and concentration, her judgment was intact and realistic, and she had appropriate and intact insight.  Id.   Havens was diagnosed with Bipolar I Disorder NOS and Personality Disorder, NOS.  Id.  Dr. Berger noted that Havens' bipolar illness and depression were improving, and assigned a GAF score of sixty.  Id.

On November 11, 2010, Havens reported doing "okay" but again noted issues with memory.  Tr. 534.  Havens was anxious and depressed, but otherwise Dr. Berger's objective findings were identical to his findings in September 2010.  Tr. 536.  Havens was taking her medication as prescribed.  Tr. 534.  Dr. Berger opined that Havens' depression was ongoing, anxiety was increased, and bipolar illness was stable; he again assigned a GAF score of sixty.  Tr. 536.

On December 16, 2010, Havens reported feeling "out of control" and buying things she did not need.  Tr. 538.  Dr. Berger noted that Havens was anxious and depressed, but otherwise noted identical objective findings to his previous examinations of Havens.  Tr. 540.  Dr. Berger diagnosed Havens with depressive disorder, major and recurrent.  Id.  He believed that Havens' anxiety was increased, her depression was ongoing, and her bipolar illness was exacerbated; he assigned a GAF score of sixty.  Id.

At a January 3, 2011 appointment, Havens stated that she was feeling better. Tr. 542.  She reported no shopping or impulsive behaviors, but did state that she felt manic and was unable to complete tasks.  Id.  Dr. Berger's objective findings were identical to those from December 2010. Tr. 544.  Dr. Berger stated that Havens' anxiety, depression, and bipolar disorder were all increased and "related to situational stressors."  Id.  He again diagnosed Havens with, *inter alia*, major depressive disorder and assigned a GAF score of fifty-seven.  Id.

On February 3, 2011, Havens stated that she was doing "so-so" and reported her mood to be a four out of ten.  Tr. 546.  Dr. Berger's objective findings were unchanged.  Tr. 548.  Dr. Berger stated that Havens' anxiety, depression, and bipolar disorder were all increased and "related to situational stressors," again diagnosed Havens with major depressive disorder, and assigned a GAF score of fifty-seven.  Id.

On March 10, 2011, Havens presented to Dr. Berger for psychiatric clearance related to bypass surgery. Tr. 641. Despite understanding the dietary restrictions that would accompany bypass surgery, Havens stated that she could "not give up soda" and reported snacking at night and using food for comfort.  Id. Dr. Berger stated that "since 2007 [Havens] has remained relatively stable and reports today that [her] mood is averaging 5/10."  Id.  Havens reported that her

bipolar illness was "alleviated by Medications." Id.  While Havens did report mood swings, she denied any manic episodes.  Id.

Dr. Berger's objective findings were essentially unchanged, though he noted that Havens' mood was no longer anxious and depressed; rather, she displayed "comfort and cooperation" during their encounter.  Tr. 647.  Dr. Berger observed that Havens' anxiety, depression, and bipolar disorder were all stable, and assigned a GAF score of fifty-seven.  Tr. 649.  Dr. Berger was unable to clear Havens for bypass surgery because of concerns with Havens' "inability to maintain current dietary recommendations as per nutritionist and [Havens'] comment 'I can't give up soda.'"  Id.  On April 7, 2011, Dr. Berger gave Havens clearance for the gastric bypass surgery.  Tr. 648.

On June 27, 2011, Havens reported that her daughter had recently committed suicide.  Tr. 741.  Havens was very angry and was having difficulty coping with her daughter's death.  Id.  Havens' mental impairments remained stable, and her GAF score remained fifty-seven.  Tr. 742-43.  However, by July 27, 2011, Havens reported having no support, being more irritable, having increased mood swings, and reported her mood to be a two out of ten.  Tr. 737.  Havens had an angry attitude and displayed irritability, but otherwise Dr. Berger's objective findings remained unchanged. Tr. 739.  Dr. Berger opined that Havens' anxiety, depression, and bipolar disorder were "improving and related to situational stressors."  Id.  He

8

assigned Havens a GAF score of forty-nine,[4] and scheduled an appointment for Havens with a therapist.  Tr. 739-40.

On August 24, 2011, Havens reported feeling "a little better;" her mood swings persisted but were less frequent. Tr. 733.  She reported feeling less impulsive, and reported a mood of four or five out of ten.  Id.  Havens had an angry attitude but improved mood from the previous visit; otherwise, Dr. Berger's objective findings were unchanged.  Tr. 735.  Dr. Berger again diagnosed Havens with major and recurrent depressive disorder, and assigned a GAF score of forty-nine.  Id.

On September 26, 2011, Havens felt more depressed, irritable, and impulsive.  Tr. 729.  She stated that her mood was five out of ten, and reported that therapy had "been very helpful."  Id.  Dr. Berger's objective findings were largely unchanged from August 2011.  Tr. 731.  Dr. Berger opined that Havens' anxiety, depression, and bipolar disorder were improving and were related to situational stressors.  Tr. 731.  He assigned Havens a GAF score of forty-nine.  Id.

On October 24, 2011, Havens reported in improvement in her mood, and she again stated that therapy had been very helpful.  Tr. 725.  Dr. Berger's findings were unchanged from the September 2011 visit.  Tr. 725-27.  On November 22,

---

[4]A GAF score of 41–50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) [or] any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." Diagnostic and Statistical Manual of Mental Disorders, 34 (4th ed., Text rev., 2000).

2011, Havens reported no mania, and reported feeling less depressed, irritable, impulsive, and isolative.  Tr. 720.  She denied any symptoms of depression or anxiety, and Dr. Berger stated that she did not exhibit any symptoms of anxiety or depression.  Id.  Havens' mood had improved, but otherwise her objective findings were unchanged. Tr. 723.  Dr. Berger increased Havens' GAF score to fifty-six. Id.

By December 20, 2011, Havens' mood had increased to a six or seven out of ten, she reported feeling less depressed, isolative, and impulsive, and reported no mania.  Tr. 717.  Though Havens had an angry attitude, her mood was euthymic, her affect was appropriate, and she had good eye contact.  Id.  Dr. Berger's objective findings remained unchanged, and he again assigned a GAF score of fifty-six.  Tr. 719.

On January 31, 2012, Havens presented for her final appointment with Dr. Berger. Tr. 713-16.  Havens stated that she was exhausted because her grandson had recently been baptized; she reported having "50% legal custody" of her grandson.  Tr. 713.  Though she was exhausted, Havens stated that her grandson made her "so happy."  Id.  Havens was doing well, and Dr. Berger noted that her mood had remained even and she was less irritable and impulsive.  Id.  Havens rated her mood as a seven out of ten, and though she had mild depression from her daughter's death, Havens stated that she was "able to handle it."  Id.

10

Havens reported an increased energy level, less frequent irritability, less frequent isolative behavior, and decreased impulsiveness. Id. She denied any symptoms of anxiety or depression, and Dr. Berger did not believe she demonstrated any symptoms of anxiety or depression. Id. Havens had a euthymic mood, her affect was appropriate to mood, and her speech was clear, fluent, and spontaneous but not "overproductive." Tr. 715. Havens' language processing was intact, her thought processes were coherent and logical, and her associative thinking was intact. Id. Havens was alert and oriented, her immediate, recent and remote memory were intact, she had normal attention span and concentration, and her judgment and insight were intact. Id. Dr. Berger diagnosed Havens with "Bipolar I Disorder Current Depressed NOS" and Personality Disorder NOS. Id. He opined that her anxiety, depression, and bipolar illness were improving and related to situation stressors, and assigned a GAF score of fifty-six. Id.

## C.    Residual Functional Capacity Assessments

On February 18, 2010, Dr. Berger completed an assessment of Havens' work-related limitations ("First Assessment"). Tr. 374-75. Dr. Berger opined that Havens had marked restrictions in her ability to: (1) understand and remember short, simple instructions; (2) carry out short, simple instructions; (3) understand and remember detailed instructions; (4) carry out detailed instructions; (5) make judgments on simple work-related decisions; (6) interact appropriately with the

11

public, co-workers, and supervisors; (7) respond appropriately to work pressures in a usual work setting; and (8) respond appropriately to changes in a routine work setting.  Tr. 374.  On August 10, 2011, Dr. Berger stated that these functional limitations still remained.  Tr. 687.

On March 30, 2011, Mark Hite, Ed.D., a state agency consultant, reviewed Havens' medical file and completed a residual functional capacity assessment.  Tr. 98-99.  Dr. Hite did not believe that Havens had any limitations in her understanding, memory, concentration, or persistence.  Tr. 98.  He believed that Havens was moderately limited in her ability to accept instructions and respond appropriately to criticism from supervisors, due to an impaired ability to "respond[] to pressures."  Id.  Dr. Hite opined that Havens did not "demonstrate significant functional limitations from a psychological point of view," though she did isolate somewhat.  Tr. 99.  Dr. Hite believed that Havens was capable of performing competitive work tasks.  Id.

On April 19, 2012, Dr. Berger completed a medical source statement detailing the work limitations caused by Havens' mental impairments ("Second Assessment").  Tr. 757-60.  Dr. Berger noted that, at times, Havens suffered from mood disturbances, emotional lability, a blunt, flat, or inappropriate affect, manic syndrome, hostility, and irritability.  Tr. 757.  Dr. Berger listed Havens' prognosis as fair, and opined that she suffered from "no cognitive impairment."  Tr. 758.  Dr.

Berger further opined that Havens was likely to miss three days of work each month due to her mental impairments.  Tr. 759.

Dr. Berger believed that Havens' mental impairments resulted in a fair ability[5] to: (1) remember work-like procedures; (2) understand and remember very short and simple instructions; (3) sustain an ordinary routine without special supervision; (4) work closely with others without being unduly distracted; (5) complete a normal work day/week without interruptions from psychologically based symptoms; (6) perform at a consistent pace without an unreasonable number and length of breaks; (7) accept instructions and respond appropriately to criticism from supervisors; (8) interact appropriately with co-workers or peers without unduly distracting them or exhibiting emotional extremes; (9) respond appropriately to changes in a routine work setting; and (10) deal with normal work stress.  Tr. 759.

Dr. Berger believed that Havens' mood lability affected her ability to respond to changes, make decisions, and interact with others; this resulted in the aforementioned limitations.  Id.  Despite these limitations, Dr. Berger believed that Havens had a good ability[6] to maintain attention and to maintain "regular attendance and be punctual within customary, usually strict tolerances."  Id.

---

[5] The medical source statement states that fair means the individual's "[a]bility to function in this area is seriously limited, but not precluded."  Tr. 759.
[6] Good means that the individual's "[a]bility to function in this area is limited but satisfactory."  Tr. 759.

Dr. Berger further believed that Havens mood lability resulted in a fair ability to: (1) understand and remember detailed instructions; (2) carry out detailed instructions; (3) set realistic goals or make plans independently of others; (4) deal with the stress of semiskilled or skilled work; (5) interact appropriately with the general public; (6) maintain socially appropriate behavior; and (7) travel in an unfamiliar place.  Tr. 760.

### D.    The Administrative Hearing

On May 9, 2012, Havens' administrative hearing was conducted.  Tr. 35-63. At that hearing, Havens testified that she was able to attend to her personal care, perform all household chores, and care for her children.  Tr. 40, 46.  However, due to her severe depression, there were times when she did not shower, brush her teeth, or change her clothes.  Tr. 46.  Though Havens generally cooked meals, when she was depressed she would sometimes tell her children to "eat whatever's in" the kitchen.  Tr. 49.  Havens cared for her young grandson overnight once per week.  Tr. 48.  Havens stated that on her worst days, she did nothing but sleep and go to the bathroom.  Tr. 47.  She stated that she liked to use her computer to play games and go on Facebook; she also enjoyed reading and watching television.  Tr. 41.  Havens regularly attended church, civic groups, and clubs.  Id.

Havens stated that she had difficulty getting along with other individuals, "depend[ing] on the situation."  Tr. 42.  Havens testified that the medications

prescribed for her mental impairments were "pretty effective" though she still had some difficulty on a daily basis.  Tr. 44.  She elaborated that by effective she meant she was "not suicidal."  Tr. 47.  Havens stated that she is a "rapid cycler," meaning she has manic and depressive episodes several times each day.  Id.  Her episodes of mania and depression were more frequent but did not last as long as they had before she began taking medication.  Tr. 52.  Havens testified that, when in a manic mood, she would be unable to concentrate, and unable to read, watch television, or use the computer.  Tr. 50.  When depressed, she would be unable to get out of bed.  Id.

After Havens testified, Francis Terry, an impartial vocational expert, was called to give testimony.  Tr. 58.  The ALJ asked Ms. Terry to assume a hypothetical individual with the same age, education, and past work experience as Havens, who was limited to medium work.[7]  Tr. 58.  The hypothetical individual was limited to simple, routine tasks, no stress, and "only occasional decision making [was allowed], and only occasional changes in the work setting" were allowed.  Tr. 59.  The individual could have no interaction with the public.  Id.

Ms. Terry opined that this hypothetical individual would not be able to perform Havens' past relevant work.  Id.  However, the individual would be

---

[7]Medium Work is defined by the regulations of the Social Security Administration as work that "involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  If someone can do medium work, we determine that he or she can also do sedentary and light work." 20 C.F.R. § 416.967.

capable of performing three other jobs that exist in significant numbers in the national economy:  a laundry worker, a public conveyance cleaner, and a hand packer.  Tr. 46-48.  Ms. Terry testified that, if an individual missed two or more days of work per month "on a consistent and ongoing basis," the individual would be unable to maintain gainful employment.  Tr. 60.

III.   **<u>DISCUSSION</u>**

In an action under 42 U.S.C. § 405(g) to review the Commissioner's decision denying a plaintiff's claim for disability benefits, the district court must uphold the findings of the Commissioner so long as those findings are supported by substantial evidence.  Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" <u>Pierce v. Underwood</u>, 487 U.S. 552, 565 (1988) (<u>quoting Consolidated Edison Co. v. N.L.R.B.</u>, 305 U.S. 197, 229 (1938)).  Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance.  <u>Brown v. Bowen</u>, 845 F.2d 1211, 1213 (3d Cir. 1988).  In an adequately developed record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence. "<u>Consolo v. Fed.Mar. Comm'n</u>, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter v. Harris, 642 F.2d 700, 706 (3d Cir. 1981), and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 203 (3d Cir. 2008). Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981).

The Commissioner utilizes a five-step process in evaluating disability insurance benefits claims. See 20 C.F.R. § 404.1520; Poulos v. Comm'r of Soc. Sec., 474 F.3d 88, 91-92 (3d Cir. 2007). This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity, (2) has an impairment that is severe or a combination of impairments that is severe, (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment, (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. See 20 C.F.R. § 404.1520. The

initial burden to prove disability and inability to engage in past relevant work rests on the claimant; if the claimant meets this burden, the burden then shifts to the Commissioner to show that a job or jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. Mason, 994 F.2d at 1064.

### A.    The ALJ's Finding at Step Three

Havens argues that the ALJ erred in finding that she did not meet or equal a listing at Step Three of the sequential evaluation process. (Doc. 14). Specifically, Havens argues that she meets the criteria for Paragraph C of Listing 12.04. Id.

To be considered disabled at step three of the sequential evaluation process, an impairment or combination of impairments must meet or medically equal an impairment listed in the Social Security Administration's Regulations. Williams v. Sullivan, 970 F.2d 1178, 1186 (3d Cir. 1992). "'For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify.'" Id. (quoting Sullivan v. Zebley, 493 U.S. 521, 529–30 (1990)) (emphasis in original). While the ALJ must "fully develop the record and explain his findings at step three," Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 126 (3d Cir. 2000), the claimant ultimately "bears the burden of presenting medical findings showing that her impairment meets or equals a listed impairment." Id. at

18

120 n. 2.  The standard for meeting a listed impairment is higher than the standard for proving disability at steps four and five.  See, Sullivan, 493 U.S. at 532.

Paragraph C of Listing 12.04 is met when an individual has a "[m]edically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support[.]"  20 C.F.R. Pt. 404, Subpt.P, App. 1, §12.04 (C).  The individual's disorder must also meet one of three other requirements.  The disorder must cause either: (1) repeated episodes of decompensation, each of extended duration; or (2) a "residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicated to cause the individual to decompensate;" or (3) "[c]urrent history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement."  Id.

Havens' mental impairment does meet the first requirement of Paragraph C; her impairment has lasted more than two years, and the ALJ found that it did result in more than a minimal limitation in Havens' ability to do basic work activities.  Tr. 17, 376-78, 713-16.  However, Havens' mental impairment does not meet or equal any one of the three subparagraphs of Paragraph C.

Havens' medical records do not document a single episode of decompensation within the relevant period, and thus the requirements of subparagraph 1 are not met.  Havens lives independently with her children; no one other than Havens or her children live in her two-story home.  Tr. 41, 46. Consequently, the requirements of subparagraph 3 are not met.

Subparagraph 2 requires that even a "minimal increase in mental demands or change in the environment" would cause an individual to decompensate.  20 C.F.R. Pt. 404, Subpt.P, App. 1, §12.04 (C) (2).  The evidence contained within the administrative record demonstrates that Havens was able to deal with minimal increases in mental demands and changes in her environment without decompensating.  For example, in late 2011 Havens gained fifty percent legal custody of her grandson, a child who was only one year old at the time.  Tr. 47, 713, 717.  The addition of this young child undoubtedly caused at least a minimal increase in Havens' mental demands and changed her environment, yet Havens did not decompensate.

In April 2011, Havens was cleared by Dr. Berger to undergo gastric bypass surgery.  Tr. 648.  This indicates that, at the very least, Dr. Berger felt Havens was psychologically capable to undergoing the mental demands of surgery, and the accompanying mental demands of maintaining a strict diet, without decompensating.  Thus, when viewed as a whole, the evidence contained within

the administrative record demonstrates that Havens' mental impairments, while severe, do not satisfy the requirements of Listing 12.04.  Consequently, even assuming that the ALJ erred in failing to fully explain her findings at Step Three,[8] such an error did not affect the outcome of the case and would be harmless.  See, Rutherford v. Barnhart, 399 F.3d 546, 553 (3d Cir. 2005).

### B.    Treating Physician Opinion

Havens' primary argument on appeal relates to the ALJ's decision to reject the opinion of Dr. Berger, Havens' treating physician.  (Docs. 14, 22).  Havens argues that Dr. Berger's opinions were thoroughly and thoughtfully completed, and were well supported by his treatment notes.  Id.  Therefore, Havens asserts that Dr. Berger's opinions were entitled to significant weight.  Id.

The preference for the treating physician's opinion has been recognized by the Third Circuit and by all of the federal circuits.  See, e.g., Morales v. Apfel, 225 F.3d 310, 316-18 (3d Cir. 2000).   When the treating physician's opinion conflicts with a non-treating, non-examining physician's opinion, the ALJ may choose whom to credit in his or her analysis, but "cannot reject evidence for no reason or for the wrong reason."  Id. at 317 (quotingPlummer v. Apfel, 186 F.3d 422, 429 (3d Cir.1999)).  In choosing to reject the evaluation of a treating physician, an ALJ

---

[8] The ALJ in this instance analyzed all relevant medical records, and outlined the available evidence in sufficient detail.  Tr. 20-26.  The AJL's decision, when read as a whole, was sufficient to permit meaningful judicial review, and therefore the ALJ did not err at Step Three. See, Jones v. Barnhart, 364 F.3d 501, 504-05 (3d Cir. 2004).

may not make speculative inferences from medical reports and may reject treating physician's opinions outright only on the basis of contradictory medical evidence. Morales, 225 F.3d at 317-18.

Substantial evidence supports the ALJ's decision to reject Dr. Berger's opinions. The ALJ found that Dr. Berger's opinions were not well supported by his treatment records, and were contradicted by those records, as well as other evidence contained within the administrative record. Tr. 25. The ALJ further found that Dr. Berger's opinion that Havens suffered from marked limitations was contradicted by the absence of any abnormal objective mental status findings. Id.

Dr. Berger's objective findings did contradict his opinion that Havens suffered from marked limitations in, or a fair ability to perform, several work-related functions. Dr. Berger consistently found that Havens' speech was clear, fluent, spontaneous and tearful. Tr. 531-49, 641-48, 713-44. At every appointment, Dr. Berger observed that Havens had intact language processing, coherent and logical thought processes, and intact associative thinking. Id. Havens was alert and oriented, her recent and remote memory was intact, she had a normal attention span and concentration, her judgment intact and realistic, and she had appropriate and intact insight. Id. These findings are inherently inconsistent with a serious limitation in the ability to remember procedures, remember short and simple instructions, and remember detailed instructions. Tr. 759-60.

22

While Dr. Berger's assessments were inconsistent with his treatment notes, the treatment notes themselves were also internally inconsistent. At every appointment within the relevant period, Havens denied anxiety or depression. Tr. 531-49, 641-48, 713-44. Dr. Berger also opined that Havens did not demonstrate any symptoms of anxiety or depression. Id. Yet Dr. Berger several times diagnosed Havens with major depressive disorder, and consistently stated that her Bipolar Disorder was accompanied by depression. Id. These inconsistencies diminished the relative weight of Dr. Berger's opinions.

The majority of the GAF scores given by Dr. Berger were indicative of moderate difficulties in occupational functioning, not the marked difficulties offered by Dr. Berger in his assessments. See, Diagnostic and Statistical Manual of Mental Disorders, 34 (4th ed., Text rev., 2000). As the ALJ noted, Havens' mental health treatment was not as intensive as would be expected if someone was so severely limited and impaired. Tr. 25. Havens visited Dr. Berger every three to six months, attended a medication checkup every one to three months, and visited a therapist every two weeks. Tr. 40.

Of additional concern are the inconsistencies between Dr. Berger's two assessments, as well as internal inconsistencies in Dr. Berger's Second Assessment. In the First Assessment, Dr. Berger opined that Havens had marked restrictions in her ability to carry out short, simple instructions. Tr. 374. However,

23

in the Second Assessment, Dr. Berger opined that Havens had a good ability carry out very short and simple instructions.  Tr. 759.  In the First Assessment, Dr. Berger stated that Havens was markedly impaired in her ability to make judgments on simple work-related decisions.  Tr. 374.  In contrast, in the Second Assessment, Dr. Berger concluded that Havens had a good ability to make simple work related decisions.  Tr. 759.  These inconsistencies undermine both assessments, and significantly impact the probative value of Dr. Berger's opinions.

Furthermore, in the Second Assessment, Dr. Berger first stated that Havens would likely miss three days of work each month due to her mental impairments.  Tr. 758.  Dr. Berger later stated that Havens had a good ability to "[m]aintain regular attendance and be punctual within customary, usually strict tolerances."  Tr. 759.  These two positions contradict one another, as missing two days of work per month is inconsistent with an employer's attendance expectations.  Tr. 60.

The totality of the evidence contained within the administrative record, including inconsistencies in Dr. Berger's own assessments, inconsistencies with the assessments as compared to the other evidence within the administrative record, and Havens' relatively conservative level of treatment, all support the ALJ's decision to give limited weight to the assessments offered by Dr. Berger.  The evidence indicates that Dr. Berger's opinions were not well supported, and the ALJ did not err in rejecting those opinions.

Furthermore, despite the Third Circuit's express preference for the opinion of a treating physician, the ALJ was entitled to reject a treating physician's opinion if a consultant proffered a contradicting opinion, even if the consultant neither treated nor examined the claimant. <u>Morales</u>, 225 F.3d at 317.  Having been presented with differing opinions, one pointing to extreme mental limitations preventing competitive work on a sustained basis, and one indicating that Havens would be able to meet the demands of competitive work on a sustained basis, the ALJ was required to credit one opinion over the other.  The ALJ credited the opinion presented by the psychological consultant, and this decision was supported by substantial evidence.  <u>See</u>, <u>Chandler v. Comm'r of Soc. Sec.</u>, 667 F.3d 356, 362 (3d Cir. 2011).

## C.   The ALJ's Residual Functional Capacity Assessment

Havens next argues that the ALJ erred in giving great weight to the functional assessment offered by Dr. Hite, but failing to incorporate all of the functional limitations offered by Dr. Hite.  (Docs. 14, 22).  Specifically, Havens contends that the ALJ did not account for Dr. Hite's opinion that Havens was moderately limited in her ability to accept instructions and respond appropriately to criticism from supervisors.  <u>Id.</u>

In her decision, the ALJ elected to give "great weight" to the opinion of Dr. Hite, reasoning that it was "consistent with and . . . supported by the evidence of

25

record, including the claimant's self-reported activities of daily living." Tr. 25.  In

turn, Dr. Hite opined that Havens was moderately limited in her ability to accept

instructions and respond appropriately to criticism from supervisors.  Tr. 98.

However, when asked to explain "in narrative form" the limitations that he had

indicated, Dr. Hite further explained that Havens' "[s]ocial skills are somewhat

impaired for responding to pressures."  Id.  Thus, Dr. Hite's opinion clarified that

Havens was only impaired in relation to pressures while at work.

When viewed in this context, the ALJ's opinion properly accounted for the

limitations suggested by Dr. Hite.  The ALJ's residual functional capacity

determination limited Havens to simple, routine tasks and "low stress."  Tr. 20.

The ALJ limited Havens to only occasional decision-making and only occasional

changes in the work setting.  Id.  These limitations not only accounted for any

difficulty that Havens may have with responding to pressures, but they also had the

effect of limiting the instructions that Havens would receive from her

supervisor(s).[9]  Therefore, the ALJ's reliance on Dr. Hite's opinion was not flawed.

Additionally, the ALJ's conclusion that Havens was not disabled is

supported by a reading of the administrative record as a whole.  The ALJ found

that the doctrine of *res judicata* applied to a previous decision of the Social

[9] "Unskilled work is consistent with simple, routine tasks." E.g., Douglas v. Astrue, CIV.A. 09-1535, 2011 WL 482501, at *5 (E.D. Pa. Feb. 4, 2011).  Unskilled work requires little to no judgment, and the duties "can be learned on the job in a short period of time."  See, S.S.R. 83-10. Thus, Havens; supervisor would not need to give a great deal of instruction to Havens.

Security Administration, a finding that Havens does not challenge on appeal.  Tr.

14-15.  This means that, as a matter of law, Havens was not disabled as of May 20,

2010, the date of the Commissioner's previous decision.  Tr. 15.  The medical

records from the relevant period pertaining to Havens' current application are

substantially similar to the records from Havens' period of non-disability.

From 2009 until April 2010, Havens' GAF scores fluctuated between fifty-

one and fifty-seven.  Tr. 376-94, 530.  During the period of time pertaining to the

ALJ's decision, Havens' GAF scores generally rested in the high fifties, although

the GAF scores briefly dipped to forty-nine for a period of four months following

the death of Havens' daughter.  Tr. 531-49, 641-48, 713-44.  At every appointment

prior to the relevant period, Havens denied anxiety or depression, and Dr. Berger

opined that Havens did not demonstrate symptoms of anxiety or depression.  Tr.

376-94, 527.  At every appointment during the relevant period, Havens denied

anxiety or depression, and Dr. Berger opined that Havens did not demonstrate

symptoms of anxiety or depression.  Tr. 531-49, 641-48, 713-44.

At every appointment prior to the relevant period, Dr. Berger noted in his

objective findings that Havens' speech was clear and fluent.  Tr. 376-94, 530.

Additionally, at these appointments Dr. Berger observed that Havens had intact

language processing, coherent and logical thought processes, and intact associative

thinking.  Id.  Havens was alert and oriented, her recent and remote memory was

intact, she had a normal attention span and concentration, her judgment was intact and realistic, and she had appropriate and intact insight.  Id.  Identical objective findings exist in every one of Dr. Berger's appointment records during the relevant period.  Tr. 531-49, 641-48, 713-44.  Consequently, when viewed as a whole, Havens' medical records indicate that her condition did not deteriorate after May 20, 2010, a date in which Havens was not disabled.  This militates against a finding that Havens was disabled.

### D.    Assessment of Havens' Credibility

Finally, Havens challenges the ALJ's determination that her testimony and subjective complaints were not entirely credible.  Tr. 21, 25-26.  Havens argues that the ALJ misinterpreted medical evidence and erroneously relied upon Havens' activities of daily living in concluding that Havens' complaints were not entirely credible.  (Doc. 14).  "Allegations of pain and other subjective symptoms must be supported by objective medical evidence."  Hartranft v. Apfel, 181 F.3d 358, 362 (3d Cir. 1999), citing 20 C.F.R. § 404.1529.  Where an ALJ reaches a credibility determination, that determination is entitled to deference by the district court because the ALJ "has the opportunity at a hearing to assess a witness's demeanor."  Reefer v. Barnhart, 326 F.3d 376, 380 (3d Cir. 2003).  See also, Morales v. Apfel, 225 F.3d 310, 318 (3d Cir. 2000) (stating that a Court "cannot second-guess [an] ALJ's credibility judgments").

The ALJ decided that Havens was not entirely credible for two primary reasons.  First, the ALJ noted that Havens' activities of daily living were "not consistent with her allegations of sever[e] and debilitating symptoms and limitations."  Tr. 25.  The ALJ believed that Havens' ability to tend to all household chores, cook meals, care for two children on a full-time basis, shop, and attend church consistently, weighed against her statements that she was severely incapacitated.  Tr. 25-26.[10]

Second, the ALJ believed that Havens' "mental status examinations, when considered as part of the longitudinal treatment record, do not support her alleged level of incapacity."  Tr. 26.  In that vein, the ALJ noted that Havens' mental status examinations were essentially normal at every appointment with Dr. Berger.  Id. Dr. Berger consistently found that Havens' speech was clear and fluent; Haven consistently had intact language processing, coherent and logical thought processes, and intact associative thinking.  Tr. 531-49, 641-48, 713-44.   She was alert and oriented, her recent and remote memory was intact, she had a normal attention span and concentration, her judgment intact and realistic, and she had appropriate and intact insight.  Id.  This evidence does contradict some of Havens' testimony, such as her alleged inability to focus on tasks at times.  Tr. 50.

---

[10]Contrary to Havens' argument, the ALJ did not rely upon these activities of daily living to conclude that Havens was capable of working; rather, the ALJ relied on those activities in concluding that Havens' statements regarding her symptoms and their limiting effects were not entirely credible.  Tr. 21, 25-26.

While none of the evidence relied upon by the ALJ is alone conclusive, taken in the aggregate, the evidence was sufficient to support the ALJ's conclusion, particularly in light of the great deference that is owed to an ALJ's credibility determinations. While another factfinder may have decided differently, the ALJ's decision is supported by substantial evidence.

IV.   **CONCLUSION**

A review of the administrative record reveals that the decision of the Commissioner is supported by substantial evidence. Pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner is affirmed.

An order consistent with this memorandum follows.

BY THE COURT:

s/Yvette Kane
Yvette Kane
United States District Judge

Dated: September 17, 2014